**KIRBY LUMBER CO. v. WEST. (No. 7759.)**

(Court of Civil Appeals of Texas. Galveston. Jan. 27, 1920. Rehearing Denied Feb. 26, 1920.)

**1. Brokers ⬦⟹86(2)—Evidence held to show contract not revoked as to commission.**

In a broker's action for commission, evidence *held* to show that, after the agreement for the broker to stand aside and let the principals complete the negotiations begun, the defendant did not consider the agency terminated, but stated that a commission would be paid, so that a peremptory instruction for defendant was properly refused.

**2. Brokers ⬦⟹88(1)—Evidence held to justify submitting question of good faith in attempted contract revocation.**

In broker's action for commission, evidence *held* to make proper the submission of issue whether the defendant company attempted to terminate the agreement after negotiations were begun, but before sale, in good faith, and not to escape payment of commissions.

**3. Brokers ⬦⟹86(6)—Evidence held sufficient to support verdict for commission on sale.**

In a broker's action for commission, evidence *held* to show that parties did not expect the trade to be made upon the original proposition, and to support the verdict in favor of broker for percentage commission on certain property sold at the price finally fixed by the parties themselves.

Appeal from District Court, Harris County; Hugh M. Potter, Special Judge.

Suit by W. W. West against Kirby Lumber Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Andrews, Streetman, Logue & Mobley, of Houston, for appellant.

Campbell, Myer, Myer & Freeman, of Houston, for appellee.

LANE, J. This suit was brought by appellee, W. W. West, against appellant,· Kirby Lumber Company, to recover the sum of $7,-000 with interest thereon, alleged to be due him by appellant for certain services claimed to have been rendered by him under an agreement between the parties concerning and connected with the purchase by appellant of certain milling properties, and a certain stumpage contract, from Simmons Bros. Lumber Company.

This case was before this court on a former appeal, the opinion on that appeal being reported in 193 S. W. 172, wherein a lengthy, full, and comprehensive statement of the nature of the case and of the facts proven upon the previous trial appear, and, as the case was by agreement of the parties again tried upon the same statement of facts, we deem it sufficient to ·reproduce such statement on this appeal.

If the rule had not been established by the Supreme Court in the case of Railway ·Co. v. Alexander, 106 Tex. 518, 172 S. W. 709, that said court would not entertain a case where the Court of Civil Appeals makes no statement of the case other than to refer to a former opinion for such statement with reference to volume, page, etc., we would adopt the forbidden method in this instance; but such being the ruling of the Supreme Court, we here copy so much of the statement made on the former appeal as is now applicable, as follows:

The plaintiff, W. W. West, in the month of November, 1912, contemplated purchasing

the sawmill plant, planing mill, and appurtenances thereto, belonging to Simmons Bros. Lumber Company, a copartnership composed of E. C. and R. M. Simmons, situated in Jasper county, Tex., and the pine timber owned by R. C. Conn on various tracts of land in Jasper county, the said timber being embraced in a certain cutting or stumpage contract between R. C. Conn and Simmons Bros. Lumber Company of date November 22, 1911.

The cutting or stumpage contract referred to was between R. C. Conn, Simmons Bros. Lumber Company, and Chicago Lumber & Coal Company of Texas, a corporation. It conveyed to Simmons Bros. Lumber Company the sound merchantable pine timber 10 inches in diameter and upwards, measured 18 inches from the ground, on all pine timber where Conn's purchasing contracts would permit, and all other sound merchantable pine timber 12 inches in diameter and upwards, measured likewise, on about 38 tracts of land in Jasper county. The contract covered, in addition, all other pine timber which Conn should thereafter purchase during the life of the contract contiguous to said described land. Simmons Bros. agreed to pay Conn $4.50 per thousand feet for the timber, payments to be made on the 10th day of each month. Simmons Bros. further agreed to cut 600,000 feet of timber per month, and pay for that much every month, whether cut or not, in addition for all cut in excess of that amount. Failure to make payment at the time provided for was to work a forfeiture of the contract at Conn's option. Simmons Bros. were required to cut all timber at a height not more than 18 inches from the ground, and to cut all timber clean off of each tract, when cutting should once be begun on a tract. Simmons Bros. were required to cut last the timber on tracts 1, 2, and 3. Scalers agreed upon were to be paid one-half by Conn and one-half by Simmons Bros. Scalers not agreed upon were to be paid by the party employing them. The Devant-Herrin scale stick was to be used. Simmons Bros. could not cut any of the timber until they had first cut the timber covered by a prior contract between the parties, but were required to commence cutting this timber immediately after the timber embraced in the prior contract had been cut. Simmons Bros. could buy no timber to be cut by them at their mill during the life of the contract, except from Conn at $4.50 per thousand. The Chicago Lumber & Coal Company guaranteed the payments of Simmons Bros. to Conn.

The plaintiff at said time, to wit, in November, 1912, called upon Mr. B. F. Bonner, vice president and general manager of the Kirby Lumber Company, with a view to obtaining from the Kirby Lumber Company a right of way over its lands should he consummate his purchase of said Simmons Bros.' mill and Conn timber, and was advised by Mr. Bonner that the Kirby Lumber Company would not grant such right of way. Mr. Bonner stated to the plaintiff that, if plaintiff could buy the property for the Kirby Lumber Company, the company would compensate him if it was bought, and asked plaintiff to negotiate for the Kirby Lumber Company if it was satisfactory with Mr. Kirby, the president of the company, and stated, further, that he would take the plaintiff in to see Mr. Kirby.

The plaintiff thereupon went in to see Mr. Kirby, and, after discussing the matter, the agreement which he and Mr. Kirby arrived at, stated in his language, is as follows:

"Mr. Kirby told me he would like for me to go over there and get a proposition on it, develop the facts in connection with it, and that, if the Kirby Lumber Company purchased it, they would compensate me for my services. The negotiations were to be conducted in my name, as there was an impression out in some way that there was not the best of feeling between the Kirby Lumber Company, or Mr. Kirby personally, and Mr. Conn. I suppose that I suggested that the negotiations be conducted in my name; I know it was understood that they were to be; Mr. Kirby agreed to that."

Thereafter the plaintiff, having been referred by Simmons Bros. to John B. Warren, of Houston, went to Kirbyville, in Jasper county, with Mr. Warren. At Kirbyville he saw R. M. Simmons and Eugene Simmons (Simmons Bros.) and R. C. Conn. He stayed at Kirbyville two or three days, and while there went out to the said mill. He looked around there, but did not spend any great amount of time in the mill. He did not take any inventory of the mill property. Simmons Bros. just told him what they had. He looked over the Conn timber on the same trip, riding horseback in doing so. He rode over the timber and inspected the mill a good long time before he came to see Mr. Bonner about getting a right of way. He thought Mr. Kirby would have the timber cruised before buying it. He and Warren, at the hotel at Kirbyville, made some figures as to the different quantities of timber on the tracts of land, but he did not preserve the figures.

Simmons Bros. and Conn did not make any proposition to plaintiff in writing. Several propositions were talked over, and Simmons Bros. said they preferred to sell outright and sell it unincumbered—to sell for a price sufficient to pay off its indebtedness and sell it unincumbered. Conn was not friendly to it, and did not favor the sale of the mill. Plaintiff did not remember whether or not Conn made a proposition as to what he would take for the timber, and did not believe he had gotten a proposition from Conn. Mr. Warren testified, and the plaintiff did not dispute the testimony, that along about the latter

part of the negotiations he and the plaintiff went to Mr. Conn's private office over the latter's bank at Kirbyville, to ascertain whether Mr. Conn would consent to an assignment by Simmons Bros. of their contract with Conn, and that Mr. Conn refused to do it. Mr. Warren further testified that Mr. Conn was very much opposed to an assignment of said contract.

The plaintiff finally got from Simmons Bros. "a proposition to sell to Mr. Kirby the whole works, timber and all; Simmons Bros. were to sell the timber and mill and pay Mr. Conn off out of the proceeds. The price was $360,000. The terms were not agreed on. Plaintiff just got a price of $360,000."

Mr. Warren testified, and his testimony was not disputed by plaintiff, that in his office in Houston, before he and plaintiff went to Kirbyville, he told plaintiff that Simmons Bros. claimed to have 60,000,000 or 65,000,000 feet of timber up there, and that sawmill and considerable lumber on the yards, and they wanted $360,000 for the timber, mill, and lumber and everything connected with the plant. Mr. Warren further testified, and his testimony in this respect was not disputed by plaintiff, as follows:

"Mr. West made a statement to me at that time as to what he thought of the $360,000 price. Of course, he thought that was too much. That price was based on an estimate of 60,000,000 or 65,000,000 feet of timber, and when Mr. West found out there was only in his judgment about 37,000,000 feet, or not over that, he thought $360,000 was too much, and stated that to me quite often, and I thought so too. Mr. West did not succeed in getting a proposition of any less figure than $360,000 when he was there at Kirbyville. We never succeeded in getting any less direct proposition. We went to Mr. Conn and talked to him with the idea of trying to convince him there was not any 60,000,000 or 65,000,000 feet of timber there, and there was not any 50,000,000 feet there. Mr. Conn's estimate was that there was about 50,000,000 or 55,000,000 feet, and we argued with him that the arbitrary price he had put on his interest in the timber was too much. Mr. Conn wanted $200,000 in cash for the timber."

After the plaintiff "got the price" of $360,000 he came back to Houston. He told Mr. Kirby it was not a good price. He told Mr. Kirby that the price he "got was $360,000 for the Conn timber and the Simmons Bros. mill." He did not consider the $360,000 proposition a good price because they did not have the timber. He testified in this connection as follows:

"The $360,000 proposition contemplated the purchase of the Conn timber. It contemplated the purchase of the entire property from Simmons Bros., and they were to pay Conn—in other words, unincumbered. The Conn timber was to be sold outright. I told Mr. Kirby that I thought the better way to handle it would be to buy the Simmons Bros. mill and take up the contract."

Plaintiff does not fix the date of this conversation with Mr. Kirby. Mr. Warren testified, and plaintiff did not dispute the fact, that he came back from Kirbyville as far as Beaumont with plaintiff, and that he got back to Houston on Sunday night; that he did not call on Mr. Kirby the next day, but called on Col. Ball and told him he thought there was a chance for the Kirby Lumber Company to get that timber; that Col. Ball tried to get Mr. Kirby on the telephone, but Mr. Kirby was in Chicago, and Col. Ball asked him to wait until Mr. Kirby got back. Mr. Warren further testified:

"When Mr. Kirby got back, the very day he got back, I went up to see him, and told him that there was a chance for him (Kirby) to buy that timber, and I told him I thought he ought to have it; that his mill was there at Kirbyville, and his tram ran through this timber, and he was in a position to pay more for it than anybody else, and that I was authorized to present it to him on a basis of $360,000 for the mill, the lumber and timber, and that Simmons Bros. had given me that price on a basis of there being 60,000,000 or 65,000,000 feet of timber there. My conversation with Mr. Kirby was not very long. He just simply told me: 'If there is that much timber there, I will take it—all I want is about two or three weeks to have it estimated by Weathersby.'"

Mr. Warren further testified:

"Mr. West had not said anything to me about whom he was getting a price for up there at Kirbyville. I did not know at the time I called on Mr. Kirby that Mr. West had any connection in the world with Mr. Kirby in the matter at all, and did not have even a suspicion of it. Nothing was said at the conversation I had with Mr. Kirby with reference to Mr. West's having gotten a price for him."

When plaintiff told Mr. Kirby that he did not consider the $360,000 a good price, that it was too high, Mr. Kirby said he could not tell about that until he had it estimated—until he had a detailed estimate made of it—until he had it "cruised." Mr. Kirby said he would send Mr. Weathersby over and have a cruise made of it. Plaintiff testified that he agreed with Mr. Kirby that there should be more of a detailed estimate than plaintiff had furnished, and that Mr. Kirby told him that he was going to send timber estimaters up there to go carefully over each tract.

It was alleged by the plaintiff, and plaintiff testified that the allegation was true, that he was advised that Simmons Bros. Lumber Company, not knowing the fact that the Kirby Lumber Company was the intended purchaser, and that the negotiations theretofore conducted between the said Simmons Bros. Lumber Company and the plaintiff were for and in behalf of the Kirby Lumber Company, intended to open negotiations

with the Kirby Lumber Company looking to the sale of the property to it. He testified that Mr. Warren told him' that he (Warren) was going to Kirby.

It was further alleged by plaintiff, and also testified by him, that thereupon he so advised the defendant, Kirby Lumber Company, through Mr. Kirby, and "it was deemed best that the plaintiff stand aside and let the negotiations be conducted thereafter directly between Simmons Bros. Lumber Company and the defendant, Kirby Lumber Company."

Under date of November 28, 1912, R. M. Simmons and E. C. Simmons (Simmons Bros.) submitted to Mr. Kirby the following proposition in writing:

"As a result of our conference with you in your office in Houston on last Tuesday, we herewith make you an offer on our timber holdings, mill, live stock, lumber, etc. For a consideration of $360,000 to be paid us by you in cash or one-half cash and the balance in short-term notes, which must be acceptable to us, deferred payments to bear legal rate of interest, we hereby agree to transfer to you all our right, title, and interest to the following property: All the timber included in the contract between R. C. Conn and E. C. and R. M. Simmons, of date November 22, 1911, subject to the tenor of the deeds of acquirement of R. C. Conn; that is, it being our intention to deed or to have deeded to you all the rights of the said R. C. Conn and E. C. and R. M. Simmons, also all rights with reference to stumpage, right of ingress and egress, etc., as recited in the deeds made to R. C. Conn by the several grantors. Be it understood that the timber included in the aforementioned contract which R. C. Conn owns in fee simple, that is, land and timber, that eight years of time from date will be allowed in which to remove the timber, and that rights of ingress and egress and other privileges necessary to the logging of the timber will be accorded. In addition to the foregoing timber we will transfer all the timber the said R. C. Conn has acquired contiguous to that specified in the contract before referred to, upon the same conditions as recited in the contract as to time of removal, etc., approximating 964¼ acres. It is our intention to transfer to you all rights that we have acquired as a result of the contract of November 22, 1912, and that of an option of a later date."

Here follows a description of the sawmill, planer, dry kiln, houses, timber, lumber, and other personal property, the offer concluding as follows:

"Would suggest that you have your men come and look the plant over. They can form an idea of its value, and can better acquaint you with our holdings than we can by letter. This offer will remain in full force and effect until December 15, 1912, and will after that date become null and void."

Plaintiff's witness R. M. Simmons, with reference to said proposition in writing, testified:

"Attached to said proposition is a proposition to E. C. and R. M. Simmons (who are Simmons Bros.) from R. C. Conn, of date November 27th, which is the day before our proposition to Mr. Kirby, November 28th. * * * That was an agreement between Mr. Conn and myself with reference to the way we could settle, provided it was sold to Mr. Kirby, and before I made that proposition to Mr. Kirby I wanted to know what Mr. Conn would agree to, because I did not want to make Mr. Kirby a proposition until I was satisfied everything was agreeable with Mr. Conn and that I could turn over to Mr. Kirby what I agreed to do."

The witness further testified that at the conversation he had with Mr. Kirby about the $360,000 proposition, which was in the latter part of November, Mr. Kirby stated that if the deal was made he would have to take care of Mr. West in the matter; he would have to pay Mr. West a commission.

Plaintiff further testified that, after he went to Kirbyville and secured the proposition, the next he heard from the proposition he had a letter from Mr. Kirby in answer to a letter from him. In his letter to Mr. Kirby, dated December 10, 1912, he said:

"Now, as the Simmons Bros. have taken the matter up with you direct, I would like to know what position you take in the matter as regards my interest in it. As the understanding with you was that in case you purchased the property that I was to get a commission on it, I would like to know whether you would now consider that I am entitled to the commission since you have commenced negotiations with them direct. As stated to you, I was in the market for something like this, but that if you wanted it, I would assist you to get it, and would not make any offer only as your agent; but now, if you think otherwise, I wish you would so advise me, in order that I may feel absolutely free to negotiate with them in my own capacity, if I should so desire to do."

Mr. Kirby replied by letter the following day, saying:

"I think I understand conditions clearly, and I have no disposition to do other than as we first talked; that is, in the event the deal is of interest to me to compensate you for your trouble as far as you have gone. I should like to have you indicate to me, however, just what you think this compensation should be. As explained to you at our interview on Monday, I cannot tell whether this deal will be regarded by our people as desirable until our cruisers have completed an estimate of the timber involved. I have made no commitment to anybody to purchase the property on any basis and am only considering the purchase to the exent of having the timber cruised—when that work is completed we shall come to a prompt decision as to whether the purchase interests us, and that decision will be somewhat influenced by the amount of compensation you expect out of the deal."

The plaintiff replied on December 13th as follows:

"I advise you that the Conn proposition would not interest me, but for a commission I would look into it, and see if a satisfactory deal could be worked up for you. I will make this commission on a 2½% basis on the entire amount of the purchase price from both Conn and Simmons, but I would want you to advise me as soon as you have come to a decision in the matter as to whether you will take it or not."

Mr. Kirby, on the same day, answered this letter as follows:

"I note that in the event we purchase the Simmons Bros. Lumber Company property you will expect a commission of 2½% upon the purchase price paid for the entire property, whatever it may be. I shall consider the negotiations with this in mind, and, in the event of any deal under the proposition now pending, your commission will be paid."

Under date of December 16th, Mr. Kirby wrote Simmons Bros. as follows:

"We did our best to conclude the cruise of the Conn timber before the 15th, but it could not be accomplished and do the work in a thorough manner. I am just now in receipt of Mr. Weathersby's estimate of the timber, and I write to advise you that at the price quoted, namely, $360,000 for the entire property, we could not entertain the purchase."

On the same day Mr. Kirby wrote the plaintiff inclosing a copy of this letter to Simmons Bros., and saying:

"I do not think from what Simmons Bros. said to me that there is any likelihood whatsoever that we will get together on any deal, so if you wish to open negotiations for your personal account you are at liberty to do so, so far as we are concerned."

The plaintiff's witness R. M. Simmons testified:

"When I put the $360,000 proposition up to Mr. Kirby, covering the Conn timber and the Simmons Bros. mill and properties, I do not know whether I said to Mr. Kirby that that was the final figure on it. The way I figured it, the amount which Mr. Conn expected to get for his timber placed me in a position where I could not make a proposition less than $360,000. I considered my property was worth so much, and Conn wanted so much. I think that one proposition Mr. Conn made to us for his timber was something like $195,000, if I remember right. The proposition I first made Mr. Kirby contemplated the outright fee-simple sale of the Conn timber and of our properties. As I stated in that contract, it was to clean up everything and take everything we had. It did not contemplate the Kirby Lumber Company's buying my mill and stepping into my shoes on the Conn contract; I did not so construe it. * * * My brother disliked the idea of selling this contract out to any one else, and Mr. Conn was adverse to it."

Under date of December 17, 1912, the plaintiff wrote a letter to L. J. Boykin, of Houston, who was then general manager of the Chicago Lumber & Coal Company of Texas. In this letter, after referring to the trade between Mr. Kirby and Simmons Bros. Lumber Company, he said:

"I have advice from Mr. Kirby several days ago that he was having the timber estimated, and as soon as he had completed it he would be ready to take up the trade. He indicated, however, that he thought the proposition they had made him was such that it would be hard for them to get together, unless it was materially reduced. He stated, I believe, that they had made a price of $360,000 for the property unincumbered."

He then suggested that Mr. Boykin, if he had sufficient interest in the matter, talk the matter over with Simmons Bros., and see if he could not get them to agree to deal with Mr. Kirby on the basis of having him succeed to their rights in the stumpage contract with Conn, letting Mr. Kirby pay Conn and pay Simmons Bros. a bonus of 50 cents per thousand feet for the timber and an agreed price for the improvements.

On December 20, 1912, Simmons Bros. wired Mr. Kirby, inquiring whether they could see him in Houston on the following Monday, which was December 23d, and Mr. Kirby replied by wire in the affirmative. On December 21, 1912, L. J. Boykin mailed to Simmons Bros. at Kirbyville a copy of the plaintiff's letter to him of date December 17th.

The plaintiff's witness R. M. Simmons testified:

"I received the letter from Mr. Boykin [meaning the one inclosing copy of plaintiff's letter of December 17th] on Sunday. I reached Houston that Sunday night (December 22d). With respect to how long before I saw Mr. Kirby, it was that I had conceived the idea of making a deal with him by having him step in my shoes in the Conn contract after I received Mr. Kirby's letter. Then I began to figure on how Mr. Kirby and I could get together, and the thought occurred to me—knowing, however, that my brother objected to it. That thought was one of the reasons that caused me to send the telegram to Mr. Kirby. I thought possibly I might get together with him on the original proposition. The thought had also occurred to me that I might be able to make a deal with Mr. Kirby, or with the Kirby Lumber Company, by having it step into my shoes on the Conn contract; and then I sent the telegram to Mr. Kirby and made an appointment with him for another date. As to whether when Mr. Kirby wrote me the letter of December 16th, and said he could not entertain the purchase, he did not ask me to come and meet him at any time or anywhere and discuss the matter with him. I do not remember the contents of said letter. If he did not ask me to do so in that letter, he did not otherwise ask me to do so. Mr. Kirby did not seek an appointment with me at a subsequent date; I am the man who sought the appointment."

This witness further testified:

"I came to see Mr. Kirby on December 22d because it developed we could not make the trade on the basis of $360,000. * * * I do not know whether I offered to make any deduction in the $360,000 or not; possibly I did. I

do not remember that circumstance. * * * I should think it had resolved itself into the proposition that when I got to Houston I had dropped the $360,000 proposition and consulted with Mr. Kirby with reference to a different sort of proposition. Originally the suggestion of Mr. Kirby's taking the mill and stepping into my shoes in this Conn contract came from me. I put that proposition to Mr. Kirby myself; that is, I thought of the proposition originally, but then there were other reasons why I did it. It was after conference with my associates. I do not know whether that proposition occurred to me before it did to anybody else or not."

With respect to the conversation between Mr. Kirby and Mr. Simmons on December 23d, and the result thereof, Mr. Simmons testified:

"The substance of said conversation was that we were unable to get together with Mr. Kirby on the original proposition, and we came at him with a different proposition, and as a result of that different proposition we were, after discussing the proposition with Mr. Kirby, turned over to Mr. Bonner and Mr. Myer."

As a result of the discussion between Mr. Simmons, Mr. Bonner, and Mr. Myer, it was agreed that the Kirby Lumber Company should take over the Simmons Bros.' holdings, together with their contract with Conn, for the price of $100,000, under the condition that Simmons Bros. were to have what they said they had, the Kirby Lumber Company reserving the right to look the property over, and the proposition being subject to Mr. Kirby's concurrence. The further understanding was that, if the proposition went through, Simmons Bros. were to operate the mill from that time on, as of date December 23, 1912, for the benefit of the Kirby Lumber Company, on a salary basis for the two brothers. About 8 or 9 o'clock on the same night, after Mr. Bonner had seen Mr. Kirby, he notified Simmons that the proposition just mentioned was accepted. On the following day, December 24, 1912, Mr. Bonner wrote the plaintiff as follows:

"Referring to the Simmons Bros. deal: Mr. Kirby has already advised you that we turned the matter down, and stated to you that if you were interested personally for you to negotiate with them on your own account. We accordingly notified Simmons Bros. that the matter was of no further interest to us. It seems now that Simmons Bros. desire to deal with us on an entirely different basis and have so approached us. We may be disposed to consider the matter on this present basis, but in doing so it is fair to you to state that it does not include any commission to you from us, and if we go forward with the deal on the new basis we will not expect to pay you any commission. If you wish to consider the purchase of the property for your own account advise us, and we will keep out."

The plaintiff answered, under date of December 28th, as follows:

"I do not think the position you take with reference to the Simmons matter is correct, and I shall expect settlement upon the basis of Mr. Kirby's letter of the 13th inst., if you should buy it. I do not think I would be open to negotiate for the purchase of the Simmons' property now, as immediately after I received Mr. Kirby's letter I made arrangements which will now conflict with the purchase of this property."

On January 29, 1913, the deal with Simmons Bros. Lumber Company was consummated by an instrument in writing, whereby Simmons Bros., for a consideration of $100,-000, conveyed to Kirby Lumber Company their sawmill and other personal properties, and assigned to Kirby Lumber Company their contract with R. C. Conn, the obligations of which the Kirby Lumber Company assumed. R. C. Conn was in no way a party to the transaction. Thereafter the plaintiff wrote the Kirby Lumber Company a letter, demanding a commission of $5,991.20. Plaintiff, West, sues for $7,000, the sum which he alleges is due by the Kirby Lumber Company, under the contract alleged by him, the same being 2½ per cent. on the $100,000 paid by the Kirby Lumber Company for the mill, and 2½ per cent. on $180,000 estimated to be paid by the Kirby Lumber Company for the Conn contract, aggregating 2½ per cent. on $280,-000. Plaintiff also prayed that, in the event the court should hold that he could not recover under the alleged contract, he be permitted to recover on the quantum meruit.

The Kirby Lumber Company contends that the proposition of sale obtained by West from Simmons Bros. Lumber Company was rejected by it; that West was notified of such rejection, and that he was also notified that his services were no longer desired by the Kirby Lumber Company in connection with the purchase of said properties; and that he was at liberty to negotiate such purchase for himself if he so desired, and that thereby the former contract and agreement between the Kirby Lumber Company and him was in good faith revoked and terminated before appellant purchased said properties, and therefore appellee, West, is not entitled to recover in this cause. It further contends that if appellee did any act or thing intending to bring about the sale of it, or which did in fact aid in bringing about said sale, after said revocation, which it denies, said appellee was a mere volunteer in so acting, and therefore appellant is not liable to appellee on the quantum meruit.

West pleaded by supplemental petition that said contract was not revoked by the Kirby Lumber Company in good faith, but that it attempted to revoke same to avoid payment of commissions to West.

On the former appeal of this case this court held that the undisputed facts showed that the Kirby Lumber Company had expressly contracted and agreed with appellee, West, that if it finally acquired the prop-

erties in question that it would pay West 2½ per cent. commission on the purchase price of the same, whatever it might be, and that therefore West should recover under such contract 2½ per cent. on the sum of $100,000, same being the sum paid by Kirby Lumber Company for the mill properties of Simmons Bros., and also 2½ per cent. on whatever sum might be shown by the evidence to be the value of the stumpage contract, unless appellant, Kirby Lumber Company, rightfully and in good faith revoked and terminated the agency of West prior to its purchase on the 23d day of December, 1912. Thereupon the *judgment in favor of the Kirby Lumber Company was reversed*, and it was further held that the only questions remaining to be determined ·were: First, did the Kirby Lumber Company revoke and terminate said agency prior to its purchase of said properties? And, second, if said agency was so revoked and terminated, was it rightfully and in good faith so revoked and terminated, not for purpose of escaping the payment of commissions justly earned by the agent, but for the purpose only of promoting the best interest of said Kirby Lumber Company?

An application by the Kirby Lumber Company for a writ of error was denied by the Supreme Court. The cause again came on for trial before a jury, upon the same facts as in the former trial; whereupon the trial court submitted to such jury the following issues, to wit:

"(1) Did the Kirby Lumber Company rightfully and in good faith, and not for the purpose of escaping the payment of commissions, if any, due W. W. West, revoke and terminate West's agency prior to the date on which the Kirby Lumber Company purchased the Simmons Bros. Lumber Company's properties?

"Answer 'It did' or 'It did not.'

"(2) What was the reasonable cash value on December 23, 1912, of the timber contract dated November 22, 1911, which the Simmons Bros. Lumber Company had with R. C. Conn?

"Answer, giving ·amount."

The jury answered question No. 1, "It did not," and No. 2, "135,000.00 cash." Upon these answers of the jury the court rendered judgment for appellee, W. W. West, for 2½ per cent. on the sum of $235,000, same being the aggregate sum of the price paid for the mill properties and the value of the stumpage contract, as found by the jury. From this judgment the Kirby Lumber Company has appealed.

As already stated, this court held on the former appeal of this case that the—

"Undisputed facts showed that the Kirby Lumber Company had expressly contracted and agreed with appellee, West, that if it finally acquired the properties in question that it would pay West 2½ per cent. commission on the purchase price of the same, whatever it might be, and that therefore West should recover under such contract 2½ per cent. on the sum of $100,000, same being the sum paid by Kirby Lumber Company for the mill properties of Simmons Bros., and also 2½ per cent. on whatever sum might be shown by the evidence to be the value of the stumpage contract, unless appellant, Kirby Lumber Company, rightfully and in good faith revoked and terminated the agency of West prior to its purchase, on the 23d day of December, 1912."

[1] Appellant attacked such holding and finding of fact upon the last trial, insisting that the undisputed evidence showed that the employment of appellee, West, as its agent to negotiate a trade with Simmons Bros. was, by mutual agreement between it and West, revoked and terminated prior to its purchase of the properties in question, by reason ·of the understanding between them that, since Simmons Bros. had begun negotiations directly with the Kirby Lumber Company, West was *to stand aside and let the negotiations* continue between said company and Simmons Bros., and under such insistence requested the trial court to peremptorily instruct a verdict for Kirby Lumber Company. The trial court having refused to so instruct the jury, appellant makes such refusal the ground of its first assignment of error.

We cannot sustain the assignment. After a careful review of the entire record, we see no reason for receding from our former ·holding. The undisputed evidence shows that, after the agreement that West was to stand aside and let the negotiations continue directly between appellant and Simmons Bros., Mr. Kirby, in a conversation with Simmons, told Simmons that if the deal was made he would have to take care of Mr. West in the matter; that he would have to pay West a commission. This statement shows clearly that Kirby did not then consider that the agency of West had been revoked and terminated. The undisputed evidence further shows that Mr. Bonner, a representative of the Kirby Lumber Company, did not consider that West's agency had been so revoked and terminated, as he wrote to West on the 24th day of December, 1912, the day after the purchase by the Kirby Lumber Company had been made and approved by Mr. Kirby, as follows:

"Referring to the Simmons Bros. deal: Mr. Kirby has already advised you that we turned the matter down and stated to you that if you were interested personally for you to negotiate with them on your own account. We accordingly notified Simmons Bros. that the matter was of no further interest to us. It seems now that Simmons Bros. desire to deal with us on an entirely different basis and have so approached us. We may be disposed to consider the matter on this present basis, but in doing so it is fair to you to state that it does not include any commission to you from us, and, if we go forward with the deal on the new basis, we will not expect to pay you any commission. If you wish to consider the purchase of the property for your own account advise us, and we will keep out."

It is further shown by the letters that passed between Mr. Kirby and Mr. West on the 10th and 13th days of December, 1912, some time after West had stood aside and after negotiations had begun between Kirby and Simmons, that Kirby did not consider that West's agency had theretofore been terminated.

[2] By the second, third, fourth, and fifth assignments it is insisted, first, that the court erred in submitting special issue No. 1 to the jury, because there was no evidence tending to show that the Kirby Lumber Company acted in bad faith in undertaking to revoke and terminate the agency of West for the purpose of escaping the payment to West of a commission, but, to the contrary, the undisputed evidence showed that West's agency had been revoked and terminated by mutual agreement of both parties prior to the 23d day of December, 1912, the date referred to in said special issue; second, that the answer of the jury to special issue No. 1 was without any evidence to support it, and that the undisputed evidence showed the Kirby Lumber Company did rightfully and in good faith, and not for the purpose of escaping payment of a commission to West, revoke and terminate West's agency prior to the date on which the Kirby Lumber Company purchased the properties in question.

We deem it unnecessary for us to again state the evidence which we think sustains the action of the court in submitting special issue No. 1, as well as the answer of the jury to such issue. This evidence has already been stated. We will add, however, that the undisputed evidence shows that Simmons Bros. made Mr. Kirby a proposition to sell him the properties in question on the 23d day of December, 1912, which proposition was finally accepted; that after Mr. Kirby and Simmons had discussed such proposition, Simmons was, on the same day, referred to Mr. Bonner and Mr. Myer, representatives of the Kirby Lumber Company, for further negotiations. As a result of the negotiations between Mr. Simmons, Mr. Bonner, and Mr. Myer, it was agreed that the Kirby Lumber Company should take the Simmons Bros.' properties for $100,000, and take over the timber contract which Simmons had with Conn, and pay Conn $4.50 per thousand feet for such timber as was on certain lands, the aggregate value of which was found to be $135,000. On the same day, December 23, 1912, and after Mr. Bonner had seen Mr. Kirby about the agreement, he notified Simmons that the proposition above mentioned was accepted, and on the following day Mr. Bonner wrote West the letter of that date hereinbefore set out. The assignments are overruled.

[3] By assignments 6 to 9, inclusive, it is, in substance, insisted in various forms that the trial court erred in rendering judgment in favor of W. W. West for 2½ per cent. upon the $100,000 paid by appellant for the Simmons Bros.' mill properties, and also for 2½ per cent. upon the value of the timber purchased by it under the contract between Simmons Bros. and Conn, which was by Simmons Bros. transferred to appellant, for the reason that there was neither pleadings nor evidence to support such judgment.

There is no merit in this contention. After having alleged the existence of the contract between the Kirby Lumber Company and West, he (West), among other things, alleged as follows:

"That the defendant, Kirby Lumber Company, purchased the said sawmill, planing mill, and physical assets of Simmons Bros. Lumber Company for the sum of one hundred thousand dollars, and agreed and bound itself to pay for said timber the sum of four and $50/100$ dollars per thousand feet, the said payment for said timber to be made to the said R. C. Conn; that plaintiff is informed and believes, and upon such information and belief alleges the fact to be, that the amount of timber lying, standing, and situate on the said tracts of land so acquired by the defendant was forty million feet, for which said timber, as above stated, the defendant, Kirby Lumber Company, agreed to pay the said R. C. Conn the sum of four and $50/100$ dollars per thousand feet, or a total of one hundred and eighty thousand dollars."

We think that it clearly appears from the evidence as a whole that the Kirby Lumber Company employed West to open up negotiations and develop conditions looking to the acquisition of the Simmons Bros.' mill properties and the Conn timber by the Kirby Lumber Company. West was expected to and did start the negotiations which finally culminated in the submission by Simmons of the very proposition accepted by Kirby. When West was first employed by Kirby it was no doubt anticipated that there would be propositions and counter-propositions before a final trade could be closed. It can hardly be supposed that either West or Kirby thought or expected that a deal would be consummated on the first offer made by Simmons to West. But few trades of this magnitude are finally consummated on the first proposition submitted. We also think it clearly appears from the evidence that when Kirby agreed to pay West 2½ per cent. upon the price paid for the properties, whatever it might be, it was understood by both parties that the 2½ per cent. was to be paid, not only on the amount paid for the mill properties, but also upon the amount paid for the Conn timber. The evidence was amply sufficient to support the finding of the jury that the quantity of timber purchased at $4.50 per thousand feet would amount in value to $135,000 and the undisputed evidence shows that Kirby had contracted to pay $4.50 per thousand feet for all of such timber.

We have reached the conclusion that there were pleadings and ample evidence to support the judgment rendered.

We have examined and considered the tenth, eleventh, and twelfth assignments, and have reached the conclusion that they, nor any of them, present reversible error. The judgment is affirmed.

Affirmed.