KIRBY LUMBER CO. v. WEST.
(No. 264–3485.)

(Commission of Appeals of Texas, Section B. Jan. 22, 1922.)

1. Brokers ⬅57(1)—Agent held not entitled to commission from purchaser who declined offer procured, but thereafter accepted different proposition to sell the same property.

An agent, who was to get a commission "in the event of any deal under the proposition now pending," which was an offer to sell to the principal a mill and the "fee-simple" title to certain timber, was not entitled to a commission where the principal determined not to take the property, but later was approached and purchased the mill and the interest of the seller in such timber under a contract with another person, who owned the same, where the rights acquired under the contract were limited in a great many ways; no deal taking place under the original proposition.

2. Brokers ⬅57(1)—Transaction held not one intended to defraud or defeat agent's commission.

Where agent procured an offer to sell fee-simple title to certain timber and a lumber mill, which proposition the principal finally determined not to carry out, held that a subsequent transaction, wherein the principal purchased the mill, but only acquired a qualified interest in the timber, was not a device to defraud the agent.

Error to Court of Civil Appeals of First Supreme Judicial District.

Suit by W. W. West against the Kirby Lumber Company. From a judgment of the Court of Civil Appeals (220 S. W. 639), affirming a judgment for plaintiff, defendant brings error. Reversed and rendered.

Andrews, Streetman, Logue & Mobley, of Houston, for plaintiff in error.

Campbell, Myer, Myer & Freeman, of Houston, and Smith, Crawford & Sonfield, of Beaumont, for defendant in error.

HAMILTON, J. Defendant in error, W. W. West, brought suit against the Kirby Lumber Company to collect $7,000 and interest alleged to be owed to him by the Kirby Lumber Company for services by him alleged to have been rendered that company in its acquisition of property described in the petition as the Simmons Bros.' Lumber Company mill and a stumpage contract between the Simmons Bros.' Company and R. C. Conn, giving Simmons Bros. the right to cut timber on the Conn tracts of land upon the terms and conditions in that contract set out. The trial court instructed the jury to return a verdict for the Kirby Lumber Company. West appealed, and the Court of Civil Appeals reversed the judgment of the trial

court and remanded the cause. See 193 S. W. 172.

At the next trial, the identical evidence offered on the first trial, as shown by the statement of facts, was read to the jury, and, upon answers made by the jury to special issues by the court submitted to it, the court rendered judgment for West. See (Civ. App.) 220 S. W. 639. The Kirby Lumber Company obtained a writ of error, and the cause is before us on assignments of error in the application for the writ set out.

Concerning his engagement and duties, Mr. West testified in part as follows:

"The way I first took this up with the company was: I went up to see Mr. Frank Bonner to get a right of way from the Simmons Bros.' Lumber Company mill to the Santa Fé Railroad, in case I could purchase the mill. I went up to ask Mr. Frank Bonner if the Kirby Lumber Company would be willing to give me the right of way. It was necessary to see them, because I understood that they— either the Kirby Lumber Company or the Houston Oil Company—owned the land between the Simmons Bros.' Lumber Company mill and the Santa Fé Railroad, and that they owned the privilege of extending the rights of way. I saw Mr. Bonner at said time, and took that matter up with him. Mr. Bonner told me that they would not give their right of way to anybody; that they would give it to me as quickly as they would to anybody, but that Mr. Conn had come in there and had taken advantage of a condition which they had created, and bought timber in their territory, and that they did not intend that he should get it out of there without hauling it out, but that if I could buy the property for me to go and see Mr. Kirby, and they would compensate me if it was bought; that is, if I could buy the property, to arrange with the Kirby Lumber Company to handle it for them. I intended to buy said Simmons Bros.' property individually when I first went to Mr. Bonner, and Mr. Bonner's proposition was that he would not give me the right of way, and he asked me to negotiate for the Kirby Lumber Company, if it was satisfactory with Mr. Kirby, and that he would take me in to see Mr. Kirby. I understand that at that time Mr. Bonner was vice president and general manager of the Kirby Lumber Company. Mr. Bonner's and Mr. Kirby's offices adjoined, and there was a door between the two.

"I then went in to see Mr. Kirby. Mr. Kirby and I began a discussion of the Simmons Bros.' property at once. I told him what Mr. Bonner had suggested to me in reference to it. Mr. Kirby told me he would like for me to go over there and get a proposition on it, develop the facts in connection with it, and that if the Kirby Lumber Company purchased it they would compensate me for my services. * * *

"At the conversation in Mr. Kirby's office it was said that the negotiations were to be conducted in my name, as there was an impression out in some way that there was not the best of feeling between the Kirby Lumber Company, or Mr. Kirby personally, and Mr. Conn. I suppose that I suggested that the negotia-

tions be conducted in my name; I know it was understood that they were to be; Mr. Kirby agreed to that."

Pursuant to this engagement, West went to Kirbyville, looked over the property, and got from Simmons Bros. "a proposition to sell Mr. Kirby the whole works, timber and all; Simmons Bros. were to sell the timber and mill and pay Mr. Conn off out of the proceeds. The price was $360,000. The terms were not agreed on. Plaintiff just got a price of $360,000."

West returned to Houston and told Mr. Kirby that the price he "got was $360,000 for the Conn timber and the Simmons Bros.' mill," and that he did not consider the price a good one because they did not have as much timber as they claimed to have—that it was too high. Mr. Kirby replied that "he could not tell about that until he had it estimated— until he had a detailed estimate made of it —until he had it cruised," and said "he would send Mr. Weathersby over and have a cruise made of it."

After West went to Kirbyville and secured the proposition, "the next he heard from the proposition" was contained in "a letter from Mr. Kirby in answer to a letter from" West, to which reference is later made herein.

In the meantime, Simmons Bros., not knowing that West obtained the price on the property for the Kirby Lumber Company, on November 28, 1912, submitted to Mr. Kirby the following in writing:

"As a result of our conference with you in your office in Houston on last Tuesday, we herewith make you an offer on our timber holdings, mill, live stock, lumber, etc. For a consideration of $360,000 to be paid us by you in cash or one-half cash and the balance in short-term notes, which must be acceptable to us, deferred payments to bear legal rate of interest, we hereby agree to transfer to you all our right, title, and interest to the following property: All the timber included in the contract between R. C. Conn and E. C. and R. M. Simmons, of date November 22, 1911, subject to the tenor of the deeds of acquirement of R. C. Conn; that is, it being our intention to deed or to have deeded to you all the rights of the said R. C. Conn and E. C. and R. M. Simmons, also all rights with reference to stumpage, right of ingress and egress, etc., as recited in the deeds made to R. C. Conn by the several grantors. Be it understood that the timber included in the aforementioned contract which R. C. Conn owns in fee simple, that is, land and timber, that eight years of time from date will be allowed in which to remove the timber, and that rights of ingress and egress and other privileges necessary to the logging of the timber will be accorded. In addition to the foregoing timber we will transfer all the timber the said R. C. Conn has acquired contiguous to that specified in the contract before referred to, upon the same conditions as recited in the contract as to time of removal, etc., approximating 964¼ acres.

It is our intention to transfer to you all rights that we have acquired as a result of the contract of November 22, 1912, and that of an option of a later date. * * * Would suggest that you have your men come and look the plant over. They can form an idea of its value, and can better acquaint you with our holdings than we can by letter. This offer will remain in full force and effect until December 15, 1912, and will after that date become null and void."

Plaintiff's witness R. M. Simmons, with reference to the above writing, testified:

"Attached to said proposition is a proposition to E. C. and R. M. Simmons (who are Simmons Bros.) from R. C. Conn, of date November 27th, which is the day before our proposition to Mr. Kirby, November 28th. * * * That was an agreement between Mr. Conn and myself with reference to the way we could settle, provided it was sold to Mr. Kirby, and before I made that proposition to Mr. Kirby I wanted to know what Mr. Conn would agree to, because I did not want to make Mr. Kirby a proposition until I was satisfied everything was agreeable with Mr. Conn, and that I could turn over to Mr. Kirby what I agreed to do."

The witness further testified that at the conversation he had with Mr. Kirby about the $360,000 proposition, which was in the latter part of November, Mr. Kirby stated that if the deal was made he would have to take care of Mr. West in the matter; he would have to pay Mr. West a commission.

The letter, above referred to, from Mr. West to Mr. Kirby, which brought in reply, from Kirby, the letter constituting the next West "had heard from the proposition," after he went to Kirbyville and got the proposition and brought it to Kirby, was dated December 10, 1912, and the body of it read as follows:

"In reference to the Simmons proposition near Kirbyville:

"I went over to see these parties, as you know, the last time acting as your agent in the negotiations, but as it was deemed to the best interest of the trade I did not use your name in connection with the matter, and all discussion with the Simmonses and Mr. Conn in reference to the purchase of the property was made with the understanding that I was purchasing it for myself and others interested with me, and, as stated to you, they referred me to Jno. B. Warren after I had interviewed them in your behalf, and Mr. Warren made a trip over there with me, and we went over the timber together.

"I did not intimate to Mr. Warren that I was getting a proposition for you, and, therefore, your name was not mentioned by any of the parties to the negotiations.

"Now as the Simmons Bros. have taken the matter up with you direct I would like to know what position you take in the matter as regards my interest in it. As the understanding with you was that in case you purchased the property that I was to get a commission on it, I would like to know whether you would now consider that I am entitled to the commission since you have commenced negotiations with them direct.

"As stated to you, I was in the market for something like this, but that if you wanted it I would assist you to get it and would not make any offer only as your agent, but now if you think otherwise I wish you would so advise me, in order that I may feel absolutely free to negotiate with them in my own capacity, if I should desire to do so.

"I wish you would advise me in regard to this as quickly as possible, and oblige."

On December 11th Kirby replied to the above letter as follows:

"I have your letter, of the 10th in regard to the Simmons Bros. proposition near Kirbyville. You stated to me that that proposition was open, that you did not care to consider it yourself, and that you would look over it if it was of any interest to me. I told you it might be of some interest to me if the price was right, and I would be glad if you would look it over, develop conditions, and in the event it was interesting to me I would compensate you for your trouble. You notified me that Simmons Brothers would come direct to me and that while you had up to that time conducted the negotiations apparently in your own interest, you thought it would be of advantage to the situation for you to drop out.

"I think I understand conditions clearly and I have no disposition to do other than as we first talked, that is in the event the deal is of interest to me to compensate you for your trouble as far as you have gone. I should like to have you indicate to me, however, just what you think this compensation should be.

"As explained to you at our interview on Monday, I cannot tell whether this deal will be regarded by our people as desirable until our cruisers have completed an estimate of the timber involved. I have made no commitment to anybody to purchase the property on any basis and am only considering the purchase to the extent of having the timber cruised. When that work is completed we shall come to a prompt decision as to whether the purchase interests us, and that decision will be somewhat influenced by the amount of compensation you expect out of the deal."

West answered the last above letter on December 13th as follows:

"I have your favor of the 12th, which is in further reference to the Simmons-Conn proposition. I think you are somewhat in error as to the way the proposition came up, and perhaps a brief explanation of it would be in order.

"The reason that I went to you with the proposition was because of the fact that I had gone to Mr. Bonner previous to the conversation with you, and had asked him if your people would give me a right of way for a tramroad over the lands owned by you between the Simmons Brothers mill and the Santa Fé Railroad, in the event I should purchase it. Mr. Bonner advised me that he did not think that the Kirby Lumber Company would be willing to do this under any conditions, but that he would discuss it with you and see what

you thought about it. I believe I mentioned to him at the time that I was figuring on the Dobbins timber, and in consideration for a right of way over this, that I would consider the Dobbins proposition no further. After discussing the Dobbins matter with you, however, I inferred from conversations with you that it would be all right for me to go ahead and trade with Dobbins if I could, and as there seemed a possibility that I would be able to conclude a trade with Dobbins on some basis, I advised you that the Conn proposition would not interest me, but for a commission I would look into it and see if a satisfactory deal could be worked up for you. I will make this commission on a ‚2½ per cent. basis on the entire amount of the purchase price from both Conn and Simmons, but I would want you to advise me as soon as you have come to a decision in the matter as to whether you will take it or not."

On December 13th Kirby replied as follows:

"I have your letter of this date and I note that in the event we purchase the Simmons Bros.' Lumber Company property you will expect a commission of 2½ per cent. upon the purchase price paid for the entire property, whatever it may be.

"I shall consider the negotiation with this in mind, and in the event of any deal under the proposition now pending your commission will be paid."

In these letters we have the contract between West and the Kirby Lumber Company.

We agree, as contended by defendant in error, that it "was a restatement of the original agreement, plus a determination as to the amount of the commissions," and in it was merged all previous agreements and understandings concerning compensation of Mr. West. As shown above, the original arrangement, as testified to by West, was: ᐟ

"Mr. Kirby told me he would like for me to go over there and get a proposition on it, develop the facts in connection with it, and that if the Kirby Lumber Company purchased it, they would compensate me for my service."

In Kirby's letter to West of date December 11th above he says:

"I think I understand conditions clearly, and I have no disposition to do otherwise than as we first talked; that is, in the event the deal is of interest to me to compensate you for your trouble as far as you have gone. I should like to have you indicate to me, however, just what you think this compensation should be."

In his letter dated December 13th, shown above, West replied:

"*  *  *  I will make this commission on a 2½ per cent. basis on the entire amount of the purchase price from both Conn and Simmons, but I would want you to advise me as soon as you have come to a decision in the matter as to whether you will take it or not."

Kirby in his reply of same date, after interpreting West's letter as claiming a commission in the event of a purchase of Simmons Bros.' Lumber Company property, says:

"I shall consider the negotiation with this in mind, and in the event of any deal under the proposition now pending your commission will be paid."

What did the words "Simmons Bros.' Lumber Company property" mean? This is determined by the evidence. Mr. West testified:

"I finally got from Simmons Bros. a proposition to sell to Mr. Kirby the whole works, timber and all. As to how they could sell the timber—they would have to pay Mr. Conn off. Simmons Bros. were to sell the timber, and the mill and pay Mr. Conn off out of the proceeds. The price was $360,000."

R. M. Simmons, a witness for West, testified concerning the offer to West:

"We made him a proposition to sell out our holdings, together with the timber and everything in fee simple, for a matter of something like $360,000. By 'fee simple' I mean that we were to buy this timber from Mr. Conn, and pay Mr. Conn in its entirety, and transfer to him our holdings, together with the timber. My understanding was that the land on which the timber was situated belonged to Mr. Conn. *  *  *  I afterwards took this matter up with Mr. Kirby, of the Kirby Lumber Company, and I made the Kirby Lumber Company practically the same proposition I made to Mr. West—$360,000. This proposition was not accepted by the Kirby Lumber Company; it was taken under advisement."

The proposition, submitted by Simmons Bros. to Kirby in writing on November 28, 1912, hereinbefore set out, is in perfect consonance and accord with the above testimony as to what Simmons Bros. were trying to sell, and therefore as to what the language "Simmons Bros.' Lumber Company property" included. It meant, not only Simmons Bros.' mill; but it meant, also, a title "in fee simple" to the Conn timber. Therefore, "in the event we purchase the Simmons Brothers Lumber Company property" means exactly and specifically *"in the event we purchase" the Simmons Bros.' Lumber Company mill and the "fee simple" title to the Conn timber.*

It must be remembered that up to the date of the last above-mentioned letter no proposition, from either of these parties to the other, looking to the Kirby Lumber Company's stepping into the Simmons Bros.' Lumber Company's shoes as to the stumpage contract, had been made. That came later, and we will consider it presently.

What, then, is the meaning of the words "in the event of any deal under the proposition now pending"? Interpreted in the light of the testimony above quoted and in that of the evident meaning of the words, "in the event we

purchase the Simmons Bros.' Lumber Company property," above stated, the words "under the proposition now pending" mean, at least, *under the proposition to sell the Simmons Brothers Lumber Company mill and the "fee-simple" title to the Conn timber.* Whether it means the proposition to sell it at a price of $360,000 only is not necessary for us to decide. We may remark while passing that we do not think it does mean that. But it certainly means the proposition looking to the sale, by the Simmons Bros., and the purchase, by the Kirby Lumber Company, of the Simmons Bros.' Lumber Company mill and the title in "fee simple" to the Conn timber, and whether at a price of $360,000 or a less price is a matter of no importance so far as a determination of the rights of litigants in this suit is concerned. The word "deal" used as a noun, as here, is defined by Webster as "an act of buying and selling." The word has also been defined by the courts as "an arrangement to attain a desired result by a combination of interested parties." Gaut v. Dunlap et al. (Civ. App.) 188 S. W. 1020. The result desired by the interested parties concerned in the proposition was the sale by the one and the purchase by the other of the Simmons Bros.' Lumber Company property as defined above. Substituting these definitions for their equivalents in the phrases "in the event of any deal under the proposition, now pending your commission will be paid," they become, "in the event of any act of buying and selling under the proposition to sell the Simmons Bros.' Lumber Company mill and the 'fee-simple' title to the Conn timber your commission will be paid;" or, using the second definition of the word "deal," "in the event of any arrangement to attain the sale by Simmons Brothers and the purchase by the Kirby Limber Company of the Simmons Bros.' Lumber Company mill and the title in 'fee simple' to the Conn timber, your commission will be paid." This was the contract between West and the Kirby Lumber Company. Tested by that contract, is West entitled to recover? We think not.

On December 16, 1912, Kirby wrote Simmons Bros. as follows:

"We did our best to conclude the cruise of the Conn timber before the 15th, but it could not be accomplished and do the work in a thorough manner.

"I am just now in receipt of Mr. Weathersby's estimate of the timber, and I write to advise you that at the price quoted, namely, $360,000.-00 for the entire property, we could not entertain the purchase.

"Mr. Weathersby's report shows 31,033,000 of merchantable pine timber on the 5,770 acres cruised by him. I do not know that these figures will be of any value to you, but I give them to you for whatever they are worth."

He inclosed a copy of this letter with one written, on the same date to West, saying:

"Herewith find copy of a letter I am to-day writing Simmons Bros. at Kirbyville in respect to the Conn land proposition.

"The quantity of timber upon these lands is very disappointing. Section 134 was estimated by Mr. Weathersby at 8,320,000 feet. Some of the other tracts carry a stand of exceeding 12,500 feet to the acre. The trouble is that many of the lands are not first-class and the general average is reduced to 5,378 feet for the 5,770 acres cruised.

"I do not think from what Simmons Bros. said to me that there is any likelihood whatsoever that we will get together on any deal, so, if you wish to open negotiations for your personal account, you are at liberty to do so, so far as we are concerned."

Thereafter, on January 29, 1913, the Simmons Bros.' Lumber Company conveyed its sawmill and assigned its stumpage contract with R. C. Conn to the Kirby Lumber Company for a consideration of $100,000. The Kirby Lumber Company assumed the obligations of the Simmons Bros. under that contract, and Conn was in no manner a party to the transaction.

[1] Defendant in error insists that:

"Plaintiff was to receive commissions if the property was found satisfactory and bought or purchased, not at any particular price, any particular terms, or in any particular manner, but in the event, as a result of the negotiations, any deal was made whereby defendant acquired the property."

The vice in this contention consists in its blurring the idea contained in the words "the property." What property was acquired by the Kirby Lumber Company? Was it the property the acquisition of which was the condition upon which the commission was to be paid to West as provided by the contract? No. It differed from that as the property rights in the Conn timber under the stumpage contract, made between the Simmons Bros.' Lumber Company and R. C. Conn, and assumed by the Kirby Lumber Company, differ from the rights "in fee simple" to the Conn timber. The "stumpage contract" is too long to set out in full. The rights acquired by the Kirby Lumber Company in its assumption of that contract were limited in various ways. It acquired, under that contract the right to cut not all the timber but only timber measuring up to dimensions specified therein. Under that contract, it became liable to pay each month for as much as 600,000 feet of timber whether or not that quantity was cut; it could cut no timber at a height greater than eighteen inches from the ground, and was bound to cut all timber clean off each tract when cutting was once begun on such tract; it had to cut certain designated tracts before it had the right to cut others; it had to provide scalers; it could not buy any timber to be cut at the Simmons Bros.' mill during the life of the contract, except from R.

C. Conn, and for such additional timber it was bound to pay $4.50 per thousand feet. The property actually and finally acquired by the Kirby Lumber Company was not the property upon the purchase of which the payment of commissions to West was conditioned in the contract made between the parties to this suit. Plaintiff in error actually acquired only limited rights in the Conn timber; the payment of commission was conditioned on its acquisition of unlimited rights to the legal title to that timber. The condition provided by the contract for the payment of a commission to defendant in error never having been realized, no commission was due him. Pryor v. Jolly, 91 Tex. 86, 40 S. W. 959. If that condition had been realized, defendant in error would have been entitled to the commission provided for in the contract regardless of any question of revocation of agency. Since it was not realized, he is not entitled to it regardless of any such question. Therefore it is unnecessary to discuss that question.

There is no evidence that the deal as made was tainted with any purpose of defeating defendant in error's right to commissions. It is shown to have been a bona fide transaction, by the following evidence:

Defendant in error's witness, R. M. Simmons, testified:

"When I put the $360,000 proposition up to Mr. Kirby, covering the Conn timber and the Simmons Bros.' mill and properties, I do not know whether I said to Mr. Kirby that that was the final figure on it. The way I figured it, the amount which Mr. Conn expected to get for his timber placed me in a position where I could not make a proposition less than $360,000. I considered my property was worth so much, and Conn wanted so much. I think that one proposition Mr. Conn made to us for this timber was something like $195,000, if I remember right. The proposition I first made Mr. Kirby contemplated the outright fee-simple sale of the Conn timber and of our properties. As I stated in that contract, it was to clean up everything and take everything we had. It did not contemplate the Kirby Lumber Company's buying my mill and stepping into my shoes on the Conn contract; I did not so construe it. * * * My brother disliked the idea of selling this contract out to any one else, and Mr. Conn was adverse to it."

Defendant in error wrote a letter to L. J. Boykin, on December 17, 1912, in which, after referring to the trade between Mr. Kirby and Simmons Bros.' Lumber Company, says:

"I have advice from Mr. Kirby several days ago that he was having the timber estimated, and as soon as he had completed it he would be ready to take up the trade. He indicated, however, that he thought the proposition they had made him was such that it would be hard for them to get together, unless it was materially reduced. He stated, I believe, that they had made a price of $360,000 for the property unincumbered."

The letter then suggests that Boykin attempt to induce Simmons Bros. to deal with Kirby on the basis of having him succeed to their rights in the stumpage contract with Conn.

On December 20, 1912, Simmons Bros. wired Mr. Kirby, asking for an interview with him in Houston on the following Monday, December 23d. Mr. Kirby replied in the affirmative. On December 21, 1912, L. J. Boykin mailed to Simmons Bros. at Kirbyville a copy of defendant in error's letter to him of date December 17th.

R. M. Simmons, defendant in error's witness, testified:

"I received the letter from Mr. Boykin (meaning the one inclosing copy of plaintiff's letter of December 17th) on Sunday. I reached Houston that Sunday night (December 22d). With respect to how long before I saw Mr. Kirby, it was that I had conceived the idea of making a deal with him by having him step in my shoes in the Conn contract after I received Mr. Kirby's letter. Then I began to figure on how Mr. Kirby and I could get together, and the thought occurred to me—knowing, however, that my brother objected to it. That thought was one of the reasons that caused me to send the telegram to Mr. Kirby. I thought possibly I might get together with him on the original proposition. The thought had also occurred to me that I might be able to make a deal with Mr. Kirby, or with the Kirby Lumber Company, by having it step into my shoes on the Conn contract; and then I sent the telegram to Mr. Kirby and made an appointment with him for another date. As to whether when Mr. Kirby wrote me the letter of December 16th, and said he could not entertain the purchase, he did not ask me to come and meet him at any time or anywhere and discuss the matter with him, I do not remember the contents of said letter. If he did not ask me to do so in that letter, he did not otherwise ask me to do so. Mr. Kirby did not seek an appointment with me at a subsequent date; I am the man who sought the appointment."

He also further testified:

"I came to see Mr. Kirby on December 22d because it developed we could not make the trade on the basis of $360,000. * * * I do not know whether I offered to make any deduction in the $360,000 or not; possibly I did. I do not remember that circumstance. * * * I should think it had resolved itself into the proposition that when I got to Houston I had dropped the $360,000 proposition and consulted with Mr. Kirby with reference to a different sort of proposition. Originally the suggestion of Mr. Kirby's taking the mill and stepping into my shoes in this Conn contract came from me. I put that proposition to Mr. Kirby myself; that is, I thought of the proposition originally, but then there were other reasons why I did it. It was after conference with my associates. I do not know whether that proposition occurred to me before it did to anybody else or not."

Concerning the interview between Mr. Kirby and Mr. Simmons on December 23d, Mr. Simmons testified:

"The substance of said conversation was that we were unable to get together with Mr. Kirby on the original proposition, and we came at him with a different proposition, and as a result of that different proposition we were, after discussing the proposition with Mr. Kirby, turned over to Mr. Bonner and Mr. Myer."

[2] These facts leave the transaction, as finally completed, without suspicion of other than a straightforward trade between Simmons Bros. and Mr. Kirby, each contending and holding out for every advantage for himself, without even a suggestion of deviation for the purpose of defeating Mr. West's claims.

After Simmons Bros. "were turned over to Mr. Bonner and Mr. Myer," it was agreed that the Kirby Lumber Company should take over the Simmons Bros.' holdings and their contract with Conn for $100,000, provided Simmons Bros. had what they represented they had; the Kirby Lumber Company reserving the right to look the property over and reserving the proposition for Mr. Kirby's approval. After Mr. Bonner had seen Mr. Kirby, he notified Mr. Simmons about 8 or 9 o'clock that the proposition was accepted. On the following day, December 24, 1912, Mr. Bonner wrote defendant in error as follows:

"Referring to the Simmons Bros. deal: Mr. Kirby has already advised you that we turned the matter down, and stated to you that if you were interested personally for you to negotiate with them on your own account. We accordingly notified Simmons Bros. that the matter was of no further interest to us. It seems now that Simmons Bros. desire to deal with us on an entirely different basis and have so approached us. We may be disposed to consider the matter on this present basis, but in doing so it is fair to you to state that it does not include any commission to you from us, and if we go forward with the deal on the new basis we will not expect to pay you any commission. If you wish to consider the purchase of the property for your own account advise us, and we will keep out."

Mr. West replied as follows:

"I do not think the position you take with reference to the Simmons matter is correct, and I shall expect settlement upon the basis of Mr. Kirby's letter of the 13th inst., if you should buy it. I do not think I would be open to negotiate for the purchase of the Simmons' property now, as immediately after I received Mr. Kirby's letter I made arrangements which will now conflict with the purchase of this property."

It is suggested that Mr. Bonner's letter is sufficient evidence of a purpose to defeat Mr. West's claims by changing the trade to require its submission to a jury. Whatever else it may show, we do not think that letter in any way tends to show that a deal, different from the one contingent on which commissions were to be paid, was made to defeat Mr. West's claims.

We recommend that the judgment of the Court of Civil Appeals and that of the trial court be reversed, and that judgment be rendered for the plaintiff in error.

CURETON, C. J., Judgments of the district court and of the Court of Civil Appeals reversed and rendered in favor of plaintiff in error.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes